(101 App. Div. 269)

## SHERMAN LIME CO. v. VILLAGE OF GLENS FALLS.

(Supreme Court, Appellate Division, Third Department. January 4, 1905.)

1. DEDICATION—USE OF PREMISES FOR SEWER—LICENSE.

One of three co-tenants who owned a strip of land was the president of the board of sewer commissioners of a village near the land, and suggested to the other commissioners that they should use a sink hole on the land as an outlet into which to discharge the sewage. After experiment, this was done, and the mouth of the sink hole was connected with an open ditch leading across the land to a river. No agreement was made between the co-tenants and the sewer commissioners as to the terms upon which the sink hole was to be used, and, when a deed giving the village the right to discharge all the water and sewage that would pass through the sewer into the sink hole was presented by the commissioners to the co-tenants for execution, the latter refused to execute it. *Held*, that there was no dedication of the sink hole by the co-tenants to the village, but a mere revocable license to use the same.

2. LICENSES—REVOCATION—LIABILITY OF LICENSEE.

A village to which a license to use a sink hole on private land for a sewer outlet was granted was not, in the absence of conditions qualifying the license, liable for injuries resulting from the exercise of the license up to the time of its revocation, but from that time it was liable as a trespasser for the discharge of any sewage into the sink hole.

Appeal from Special Term, Warren County.

Action by the Sherman Lime Company against the village of Glens Falls. From the judgment rendered (87 N. Y. Supp. 95), plaintiff appeals. Reversed.

Prior to 1891 Darwin W. Sherman, Henry G. Lapham, and Augustus Sherman, as co-tenants, owned a certain strip of land lying between the village of Glens Falls and the Hudson river; such lands consisting of lime rock to the depth of 12 feet or more from the surface, and which was porous in its nature, and from which they were, as copartners, engaged in the manufacture of lime under the firm name of the Sherman Lime Company. Augustus Sherman having died, his representatives succeeded to his interest, and continued the business with the surviving copartners. In 1891 the village of Glens Falls entered upon the construction of a system of sewers, which was designed to sewer the whole village; the lowest point in such system being in Warren street, and not far from the above-mentioned lands. The village, being prevented from extending this system from such point into the Hudson river, was compelled to look elsewhere for a place into which to discharge its sewage. There was a fissure or sink hole, so called, existing upon the above-described lands, into which it had been the custom for some time to collect and discharge surface water and water from a dry dock located upon lands of said Darwin W. Sherman. From the fact that such water found free discharge through such sink hole, it was suggested by Sherman that the sewer system might be connected therewith, and that it would prove a sufficient and available outlet into which to discharge the same. After some experiment, the board of sewer commissioners of said village, of which said Sherman was the president, concluded to extend the system to such sink hole, and to utilize it as the place into which the sewer should be discharged. They thereupon proceeded to extend the sewer from Warren street to the sink hole, across lands of said Sherman individually, and also across the lands of the company aforesaid, and built a brick structure over such sink hole; and thereafter the whole sewage of the village was discharged into said sink hole, and the same was received and carried off therein, and continued to flow freely therefrom, until about the year 1897, when such sink hole failed to fully carry away the amount of sewage discharged therein, and the same began to overflow and spread over the said lands of the lime company, and caused an offensive smell, and began to work injury to its property. The said village thereupon connected the mouth of the sink hole

with an open ditch extending across said company's lands to the Hudson river. From time to time while the sewage was so received into such sink hole, the village enlarged its sewer system, so that a much larger amount of water and sewage was discharged through it at the time that the sink hole began to overflow than had at first been discharged into it. In January, 1894, the property of the said Sherman Lime Company was transferred to the plaintiff in this action. Subsequently, when the water and sewage began to overflow the mouth of said sink hole, and to work an injury to its property, it complained to the sewer commissioners of the village of such injury, and asked them to remedy the same. Negotiations were continued for some year or two over such matter, and on the 23d day of March, 1903, it served upon them a notice to withdraw from its land all structures belonging to the sewer system, and cease to any longer deposit sewage into said sink hole or upon its lands. Subsequently, upon the failure of the village to so do, this action was brought for a perpetual injunction against the use by the village of the sink hole as the point into which to discharge its system of sewers, and for damages for injuries sustained therefrom. The trial court ordered judgment restraining and enjoining the defendant as is hereinafter stated in the following opinion, and for $1,000 damages and costs. From such judgment this appeal is taken.

Argued before PARKER, P. J., and SMITH, CHASE, CHESTER, and HOUGHTON, JJ.

Potter & Kellogg, for appellant.
William M. Cameron, F. A. Rowe, and Chas. R. Patterson, for respondent.

PARKER, P. J. The trial court based the judgment which it rendered in this case upon the theory that the Sherman Lime Company, the predecessor of the plaintiff, dedicated to the defendant the right to lay down and maintain across its lands the sewer pipe that connects the sewer system of the village with the sink hole, so called, and also land 40 feet square upon which the brick structure over such hole is built; also the right to use, as a part of its sewer system, such sink hole, and the underground fissure or passage leading therefrom, wherever such passage might go, to its full capacity, for carrying away the water and sewage discharged therein. And it held that by reason of such dedication the defendant has the right to continue the occupation and use of said premises for the purpose of maintaining and repairing its sewer, including said sink hole and fissure and the building thereon. It further held that the construction of the overflow pipe, and any use of such premises for the purpose of discharging sewage, by means other than by said fissure, had been under a license from the owners of the plaintiff's property, which license had been terminated on March 23, 1903, and the use of the overflow pipe and of said premises, other than by said sewer and fissure, since that date, had been without authority and in violation of plaintiff's rights. The effect of this holding was to limit the defendant's rights to a discharge of its sewage into the sink hole so far as the same would fully receive and vent it. Beyond such a use, it was enjoined from going. In other words, the sink hole, and the fissure extending beyond it, was to be deemed a part of the defendant's sewer system, and it was obligated, therefore, to protect the plaintiff and all adjacent owners from its overflow. Hence the injunction and the damages resulting from the overflow since the license was revoked.

The plaintiff contends that no dedication was ever made by the owners to the defendant; that all the circumstances attending the construction of the sewer system, and its connection with the sink hole, show a license merely to so discharge from the sewer system into it; and that, when that license was revoked, any and all privileges which the defendant claimed therefrom also ceased. The question presented, therefore, seems to be whether such circumstances established a dedication, or amounted to no more than a license.

It is plain from the evidence that, when a survey had fixed the lowest point of the sewer system in Warren street, it became an important and troublesome question as to the place where the water and sewage were, from that point, to be taken. They could not discharge into the river, because the State Board of Health had forbidden them. Yet they must be carried somewhere. And so it was suggested by D. W. Sherman, who was the president of the board of sewer commissioners, and an owner of a third of the property in question, that it be taken into the sink hole. He seems to have been of the decided opinion that such hole would take and vent all that the sewer system would carry into it. An examination was had, and some trials were made by the engineer in charge; and finally it was concluded by the board to adopt the plan of such survey, and build with reference to utilizing such sink hole as the place into which all sewage passing through the system of piping should be discharged. Undoubtedly D. W. Sherman advised the adoption of such plan, and undoubtedly he believed that it would prove sufficient for the purpose. But I do not discover in the record that he did or said anything that would amount to a dedication to the village by said company of any of its property, or of the right to use such sink hole as the mouth of its sewer. And particularly am I unable to find any proof that any of the owners of the other two-thirds of such property either said or did anything that would amount to such a dedication. Concede that they were aware of the conclusion to so use the sink hole, and made no objection thereto, and concede that they knew that D. W. Sherman advised and even urged the commissioners to do so; yet such action on their part did not amount to a dedication or even to an offer to dedicate their property. Nor do I find that any fact is established indicating that the commissioners, on their part, so understood it.

It is clear that no agreement was made at the time as to the terms upon which the sink hole was to be taken, but it was the undoubted understanding upon both sides that the village would have no right to in any way damage the property of the Sherman Company. Such a limitation upon its rights repels the idea of a dedication such as the trial court has found was then made. Besides, it appears that the commissioners caused a conveyance of such rights as they supposed they would need to acquire from the Sherman Company to be drawn up and presented to D. W. Sherman and to Lapham for execution. That conveyance makes no mention of the use of the fissure leading from the sink hole as a part of its sewer system. It makes no suggestion of a limit to the quantity of water and sewage that was to be discharged therein. It gives the right to discharge into the sink hole all the water and sewage that would then pass through the sewers as then

laid; that is, to use the sink hole as the outlet of its sewer system, and to thus subject the lands of the Sherman Company to any damages that might be caused by such sewage after it had once left the sewers of the village and passed into the sink hole. If the village was to acquire title to such an easement either by deed or by dedication, it is. clearly inconsistent with the idea that what it took from the owners was to be entirely harmless to them. This conveyance the two owners, Sherman and Lapham, refused to execute, and never did sign the same; thus affording very plain evidence that they did not intend to permanently donate to the village any such right as that. The trial court has found that the dedication was of the right to discharge a limited amount of sewage through the sink hole, and to use the fissure leading therefrom as a part of its system. But this idea is repelled by the privileges specified in the deed, and there is no suggestion anywhere in the record that anything was said of such a limitation to the use which the village was to take. Such an idea does not appear to have occurred to either party.

I am of the opinion that both parties understood that it was more or less doubtful whether the sink hole would vent all the water and sewage that the sewer system required from it, but it was hoped it would; and, for want of a better place, the commissioners availed themselves of the privilege of discharging into it. If it should prove that all necessary sewage passed through freely, without any injurious effect upon the plaintiff's property, then undoubtedly the permission to use the sink hole as the outlet of the sewer would be continued, and it would prove a cheap and easy method of procuring an outlet. If the owners should withdraw permission, even though no harm was done them, then no serious injury could be done the village, as it would always have the power to acquire such rights by condemnation. If, upon actual use, the sink hole proved insufficient as an outlet, it was as reasonable for the village to take the chances as it would be for the owners to take them. In view of such conditions, I am of the opinion that a mere license to use the sink hole as the outlet to its sewer system was given the village, and that no dedication thereof was made or intended. The right to revoke such a license is not disputed. I conclude, therefore, that the injunction should have been extended not only to the overflow, but also to the use of the sink hole as the outlet of its sewer system. The village had never acquired any right to discharge into the same, other than as a mere licensee, and from the time of the revocation it has been a trespasser. So long as it was discharging sewage into that sink hole under a license from the owners of such premises, the injuries resulting therefrom, in my opinion, the village would not be responsible for, unless it should be made to appear that such license was modified or affected by conditions not found or passed upon in the decision now before us; and it would seem that these plaintiffs permitted the license to continue in force until March, 1903. Such injuries as occurred therefrom while the defendant was trespassing upon the plaintiff's lands, the defendant is responsible for.

For these reasons, I am of the opinion that the judgment should be reversed and a new trial should be granted. The condition of the case

does not seem to warrant this court in modifying the findings and directing final judgment in the matter.

Judgment reversed on law and facts, and new trial granted, with costs to appellant to abide the event. All concur.